**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-1995-WJM-STV

CHRISTOPHER FISCHER;
JESSICA FISCHER;
M.F. (by and through her next friend Jessica Fischer); and
T.F. (by and through his next friend Jessica Fischer),

      Plaintiffs,

v.

DREW KLESCEWSKI;
NICHOLE BACKUS;
H&M HENNES & MAURITZ LP ("H&M");
OFFICER JOSH VAUGHN, Broomfield Police Department (sued in his personal capacity for damages);
OFFICER MICHAEL DEEDON, Broomfield Police Department (sued in his personal capacity for damages);
OFFICER JEREMY EHRLICH, Broomfield Police Department (sued in his personal capacity for damages); and
SERGEANT HEIDI WALTS, Broomfield Police Department (sued in her personal capacity for damages);

      Defendants.

---

## ORDER ON PENDING SUMMARY JUDGMENT MOTIONS

---

      Plaintiffs Christopher and Jessica Fischer, along with their children M.F. and T.F. (collectively, the "Fischers"), bring this action against two groups of Defendants: the "H&M Defendants," comprising H&M Hennes & Mauritz LP and two of its employees, Drew Klescewski and Nicole Backus; and the "Broomfield Defendants," comprising Josh Vaughn, Michael Deedon, Jeremy Ehrlich, and Heidi Walts, all of whom are members of the Broomfield Police Department.  The Fischers claim that these various Defendants' actions resulted in false arrest, malicious prosecution, and related injuries,

all flowing from an incident in which Christopher Fischer referred to H&M store manager Drew Klescewski as an "asshole"—once or multiple times, to Klescewski's face or not, depending on whose story one believes—because Klescewski allegedly behaved insensitively when Jessica Fischer slipped and fell inside an H&M store.

Currently before the Court is the Broomfield Defendants' Amended Motion for Summary Judgment (ECF No. 80) and the H&M Defendants' Motion for Summary Judgment (ECF No. 81). For the reasons explained below, the Court grants the Broomfield Defendants' motion in full. As for the H&M Defendants' motion, the Court is frankly loathe to spend a week of its and a jury's life determining the number of times Christopher Fischer said "asshole," but the Court nonetheless finds that this and similar questions of fact prevent summary judgment on the Fischers' claims for malicious prosecution and exemplary damages. The Court will, however, grant the H&M Defendants' motion with respect to the Fischers' claim for intentional infliction of emotional distress.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for

the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

This case revolves almost entirely around an incident that took place on the evening of December 14, 2014, at the H&M clothing store in Broomfield's Flatirons Crossing Mall. The following facts are undisputed unless otherwise noted.[1]

### A.   The Fischers' First Encounter with Klescewski

The Fischers arrived at the mall a little after 6:00 on the evening in question and apparently went directly to H&M, entering the store through an exterior entryway. (*See*

---

[1] The Fischers have submitted various surveillance videos of the incident. (*See* ECF No. 102.) These videos are heavily edited and contain captioning apparently inserted by the Fischers' counsel through a computer program. This captioning is sometimes argumentative, and sometimes provides factual elaboration on the events supposedly transpiring in the video (although without citation to the record to support that elaboration). In other words, the entire purpose of these videos, as submitted, is basically argumentative. The Court will consider these videos as if they had been submitted without the captioning, but absent a stipulation of the parties, these videos could not be admitted at trial with the captioning. As for other editing —such as jumping between camera angles, presenting certain portions in slow-motion, or synchronizing external audio sources with the video—the Court leaves it to the Fischers to break the edited segments into discrete exhibits to which the H&M Defendants can stipulate or object. In other words, the Court does not wish to be presented with a 15-minute compilation (such as the Fischers' current Exhibit B) and then be required to rule on a second-by-second basis which segments are admissible and which are not.

3

ECF No. 81 at 3, ¶¶ 4–5.)  It had been snowing earlier that day, so the ground outside was wet and someone at H&M had placed a "wet floor" caution sign at the entrance of the store, although the parties dispute whether this sign was easily visible to entering patrons.  (*Id*. ¶¶ 2–3.)[2]  In any event, Jessica Fischer, while carrying her son T.F., slipped and fell upon entering the H&M.  (*Id*. ¶ 4.)

The Fischers then approached a nearby employee—who turned out to be Defendant Drew Klescewski ("Klescewski")—and informed him of the incident.  (*Id*. ¶ 6.) The Fischers claim that Klescewski reacted apathetically and dismissively, and was "smirking" when he told the Fischers that H&M officials would not permit him to put a rug down at the store's entrance.  (*Id*. ¶¶ 8–10.)  Jessica then remembers her husband, Christopher, making a sarcastic comment to the effect of, "'Wow, that's amazing customer service' or something like that."  (ECF No. 99-1 at 213.)

## B.    The Confrontation at the "Cash Point"

The Fischers then walked to the cash register area—which all parties dub the "cash point"—and asked a different employee if they could speak with the manager. (ECF No. 81 at 4, ¶ 15.)  The employee summoned the manager, who turned out to be Klescewski.  (*Id*.)  The ensuing exchange between Klescewski and the Fischers near the cash point is one of the focal points of the parties' dispute.

According to Klescewski and another H&M employee who was standing behind the cash registers, Defendant Nichole Backus ("Backus"), Christopher Fischer became

---

[2] The Court could likely make a judgment as a matter of law on this question given that surveillance video clearly shows the location of the wet floor sign relative to the entrance.  But the Court will not make any finding in this regard because nothing in this case turns on this dispute (there is no premises liability claim, for example).

red in the face, had throbbing neck veins, puffed out his chest, and advanced toward Klescewski in an intimidating manner, while Jessica Fischer began yelling.  (*Id*. ¶¶ 16–20.)  The Fischers deny all of this, pointing to the security camera footage (their Exhibit C).  Unfortunately, that footage was shot from far away and at a poor angle. Without the Fischers' explanation (ECF No. 103 at 2), the Court would never be able to tell who was who and what is allegedly going on, given that the interaction in question is mostly obscured by a clothing rack and the only visible movements are two (or potentially three) pairs of legs seen from mid-thigh downward.  Moreover, everyone in question was wearing black pants, or pants that look black on the security footage. However, the Fischers claim that an individual wearing gray shoes was Christopher Fischer—a claim supported by other video segments—and that gray-shod individual is seen backing away from the other individual (allegedly Klescewski) at least four times, rather than advancing toward him.

As for words spoken during this encounter at the cash point, Christopher Fischer asked to speak to a different manager but Klescewski stated that he was the manager with whom the Fischers needed to speak.  (ECF No. 81 at 4, ¶ 22.)  Jessica Fischer challenged Klescewski on his claim that H&M would not permit him to put a rug at the front entrance.  (*Id*. ¶ 23.)  Klescewski again stated that he did not have authority to put down the rug, and Christopher Fischer perceived Klescewski's tone of voice as "snarky" when he said this.  (*Id*. ¶¶ 23–24.)  Klescewski says that Fischer twice called him both an "asshole" and a "jerk."  (*Id*. at 5, ¶ 26.)  The Fischers claim that Christopher only used the word "asshole" once, and that it was made in the context of a comment to his wife: "Mr. Fisher [*sic*] looked over at his wife and said: 'Wow, this guy's an asshole.'"

5

(ECF No. 97 at 3.)  Klescewski was nonetheless only one or two feet away when these words were spoken.  (ECF No. 81 at 5, ¶ 31.)  Klescewski then said, "If you talk like that in my store, I'm going to have to ask you to leave or I'm going to call the police," to which Christopher Fischer responded in a raised voice, "Maybe you should call the police."  (*Id*. ¶ 28.)

Around this point, M.F. and T.F. left the store and entered the mall proper, unbeknownst to their parents.  (ECF No. 80 at 5, ¶ 6.)[3]  Also around this time, Klescewski moved away from the Fischers and went behind the register counter, while another store supervisor or manager, Taylor Winter-Martinez, approached the Fischer parents and asked whether she could do anything to help.  (*Id*. at 2, ¶ 1; *id*. at 5, ¶ 33.)  The Fischers reported Jessica's slip-and-fall.  (*Id*.)  While this conversation was ongoing, Klescewski approached Backus (still behind the register counter) and can be seen on the surveillance video saying something to her, after which Backus dialed 911.  (*Id*. ¶ 35.)  Apparently as that call was going through, the Fischers agreed to fill out an incident report for Winter-Martinez, and Winter-Martinez then left that area of the store to retrieve an incident report form.  (*Id*. ¶¶ 33–34.)

## C.    Backus's 911 Call and the Police's Arrival[4]

Meanwhile, the 911 dispatcher had picked up Backus's call and Backus reported

---

[3] A caption on one of the Fischers' edited surveillance videos alleges that the children left because they were "anxious to see Santa."

[4] All of the quotations from Backus's 911 call in this Part II.C are the Court's own transcription from the audio that the Fischers overdubbed onto the security camera footage submitted at their Exhibit B (ECF No. 102), beginning at security camera timestamp 6:12:45. The narrative in this Part comes from the same video.

"a customer that is getting really belligerent with one of our managers and yelling at them [*sic*]."  By this time, Christopher Fischer had left the store, apparently to find his children, and Jessica Fischer started walking to the back of the store, where Winter-Martinez had gone.  Backus reported to the 911 dispatcher that Christopher Fischer was "swearing at our manager and yelling really loudly, and kind of making a scene."  The dispatcher then asked, "What's he mad about, do you know?"  Backus responded, "No, I think he's mad about one of the signs or something . . . .  He's yelling about, 'oh, there's false advertising' or something, 'I'm gonna sue you,' 'you're an a-hole,' stuff like that."

The 911 dispatcher inquired, "Is he still there?"  In a tentative tone of voice, Backus replied, "I think he went to the front of the store," and then put down the phone to contact Klescewski through a handheld radio: "Drew, is that guy still in the store?"  Klescewski radioed back a non-answer: "We're going to fill out an incident report for the lady [Jessica Fischer]."  Backus then said something to Klescewski about "sending someone over" or "sending some people over"—possibly referring to the Broomfield Police Department, but the audio is very difficult to understand.  Backus then picked up the telephone and told the 911 operator, "Yeah, they're hanging out in the front of the store.  They're still making a ruckus."  In fact, Christopher had left the store by this time and Jessica was in the back of the store, pacing and apparently waiting for Winter-Martinez to return with the incident form—although Jessica later made her way back to the front of the store to examine the area where she slipped.

Defendant Michael Deedon ("Deedon"), a Broomfield police officer, approached the exterior of the store about this time.  As he arrived, the 911 dispatcher asked

Backus, "Are you able to see them [the Fischers] from your, from your location?"
Backus answered, "I can't, but my manager is watching him on the camera."  Nothing in
the record supports this answer.

The 911 dispatcher then said that some officers should arrive shortly—and the
video shows that Deedon was in fact in the store by then.

## D.   Christopher's Arrest

The security camera footage becomes almost useless at this point, as none of
the ensuing material events is visible (with one partial exception, described below).
However, it appears undisputed that Deedon and two other defendants—Broomfield
police officers Josh Vaughn ("Vaughn") and Jeremy Ehrlich ("Ehrlich")—encountered
Jessica Fischer somewhere near the cash point less than a minute after Backus put the
911 dispatcher on hold.  These officers had received a report that "a male and female
customer were making a scene.  The man was about 6 feet tall with brown hair.  The
male was belligerent and swearing at the manager."  (ECF No. 80 at 5, ¶ 3 (citations
omitted).)  Deedon claims that he asked Jessica to help him find her husband.  (*Id.* at 6,
¶ 8.)  Jessica denies that Deedon ever made such a request.  (ECF No. 98 at 2, ¶ 8.)
For unknown reasons, however, Jessica volunteered to the police that Christopher had
said to her, "'Wow, this guy [Klescewski] is an asshole,' or something to that effect."
(ECF No. 80 at 6, ¶ 9.)  Around the same time, Klescewski himself spoke with Deedon
and reported that "he [had been] called an asshole and a jerk several times and that he
felt physically threatened by Mr. Fischer."  (*Id.* ¶ 10.)

Ehrlich must have heard at least Jessica's report of Christopher's "asshole"
statement because he soon located Christopher a little ways outside the H&M store, in

8

the mall itself, and informed him that "Mrs. Fischer said he called Mr. Klescewski an asshole." (ECF No. 98 at 3, ¶ 13; *see also* ECF No. 80 at 6, ¶ 12.)  Christopher claims that he clarified to Ehrlich that his comment had been made to his wife, although referring to Klescewski. (ECF No. 98 at 3 ¶ 13.)  Christopher refused to provide any information to Ehrlich about himself other than his first name, refused to provide identification, and eventually refused to answer any questions at all. (ECF No. 80 at 6–7, ¶¶ 12, 15–16.)

Although the record does not specify when, Deedon eventually joined this interaction and decided to arrest Christopher under Colorado's misdemeanor harassment statute, discussed further in Part III.B.2, below. (*Id*. at 7, ¶ 17.)  Deedon believed he had probable cause at least based on what he had learned from the 911 dispatcher and from Klescewski. (*Id*.)[5]

At the time of Christopher's arrest, M.F. and T.F. had been with him. (*Id*. at 8, ¶ 19.)  A fourth Broomfield officer, Defendant Heidi Walts ("Walts"), had appeared by that point and began escorting the children back to Jessica Fischer inside the H&M store. (*Id*.)

### E.    Jessica's Detention

By this time, Winter-Martinez had rejoined Jessica Fischer inside the H&M store with an incident report for Jessica to fill out, but Jessica no longer wished to submit a report. (*Id*. ¶ 20.)  She says she changed her mind in this regard "[a]fter it became clear

---

[5] The argumentative portion of the Fischers' summary judgment brief alludes to Christopher being taken to a jail and kept there for some amount of time (*see* ECF No. 98 at 19), but no party makes any factual allegations in this regard.  The record therefore does not reveal how long Christopher spent in jail.

to [her] that the police were not there to help, that her husband was taken into custody and she was being treated like a suspect."  (ECF No. 98 at 4, ¶ 20.)

Jessica instead told Vaughn—the police officer who apparently stayed with Jessica while Ehrlich and Deedon went out to speak with Christopher—that she wanted to call "her police officer friend."  (ECF No. 80 at 8, ¶ 21.)  Vaughn told her that "he could not have her using her phone."  (*Id*. ¶ 22.)  Vaughn did not want Jessica using her phone at that time "based on a training he had received about an officer who was injured when a person on scene used their phone to text someone who later arrived at the scene and ran the officer over with the vehicle."  (*Id*.)[6]

Vaughn asked Jessica to surrender her phone, Jessica refused, and then Vaughn reached to take Jessica's phone out of her hand, telling her to "stop resisting."  (*Id*. ¶¶ 23–24.)  Some sort of scuffle ensued, about which the parties have their own stories which diverge from each other and from the short segment of security camera footage that shows the scuffle.  The Broomfield Defendants simply assert that Jessica and Vaughn both "backed into a nearby display."  (*Id*. at 9, ¶ 25.)  The Fischers, by contrast, say that Vaughn grabbed Jessica's hands, "started twisting," and "kept pushing [Jessica] back until she fell into a collection box and knocked it over."  (ECF No. 98 at 5, ¶ 25.)  The Fischers claim that their story is "clearly depict[ed]" in the security camera footage (*id*.), but the footage actually shows Vaughn slowly pushing Jessica backward in an almost dance-like pose, with Vaughn's left hand holding Jessica's right, and Vaughn's right hand on Jessica's left upper arm or shoulder.  (ECF

---

[6] The Fischers deny this but then provide no evidence to refute it.  (ECF No. 98 at 4, ¶ 22.)  The Court therefore deems Vaughn's motivations undisputed.

No. 83, Video Clip 2.)  Some sort of container, perhaps less than waist-height, is behind Jessica and being pushed backward with her, but then it is pushed off screen.  Jessica never falls into anything.

The scuffle ended when Vaughn succeeded in taking the phone away from Jessica; and, almost simultaneously, Walts arrived and immediately grabbed Jessica from behind to place her in handcuffs.  (*See* ECF No. 80 at 9, ¶¶ 26–27.)  Walts says that she took this action "to ensure officer safety and maintain the investigation."  (*Id.* ¶ 26.)  Ehrlich, Vaughn, and Walts then guided Jessica and her children to "the Community Room of the mall," where they removed Jessica's handcuffs.  (*Id.* ¶¶ 29–30.)  No party describes this "Community Room" or points the Court to evidence of the length of time that Jessica and her children spent there,[7] but Jessica was never charged with any crime.  (*Id.* ¶ 31.)

## F.    Disposition of the Charge Against Christopher Fischer

Formal court proceedings against Christopher Fischer on his harassment charge were instituted by Deedon through a misdemeanor summons and complaint.  (ECF No. 98 at 8, ¶ 5.)  A Seventeenth Judicial District prosecutor, Candyce Choi Cline ("Cline"), was assigned to the case.  (ECF No. 80-9 ¶ 2.)  Cline had no contact with any of the Broomfield Defendants or the H&M Defendants while investigating the case.  (ECF No. 81 at 8, ¶ 59; ECF No. 80 at 10, ¶ 34.)  She eventually dismissed the harassment

---

[7] In argument, the Fischers claim that Jessica was "detained for an hour."  (ECF No. 98 at 11.)  Because this statement was not presented in their Statement of Additional Disputed Facts, the Broomfield Defendants had no opportunity to admit or deny it, and therefore the Court cannot consider it.  *See* WJM Revised Practice Standards III.E.5, 6(b).  In any event, the Fischers cite no supporting evidence and therefore fail in their duty to establish facts through citations "to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).

charge, "but not for lack of probable cause." (*Id*. ¶ 33.) Rather, "the decision was made

to dismiss the case on the grounds that there was no reasonable likelihood of

conviction at trial given that there was a question as to whether the charge against

Mr. Fischer could be proven beyond a reasonable doubt." (ECF No. 80-9 ¶ 5; *see also*

ECF No. 81 at 8, ¶ 60.)

## G.      Effect on the Fischers

The Fischers claim "profound emotional distress" over this event.  (ECF No. 98

at 7, ¶ 2.)  They assert that they "think about it constantly, they do not go to Malls much

anymore, and they are so anxious over interacting with police officers that they avoid

interactions." (*Id*.)  Jessica claims that she broke down crying during a routine traffic

stop in October 2016, and attributes that emotional response to the encounter with

police on December 14, 2014.  (*Id*. ¶ 3.)  The Fischers further claim that the children

"have been profoundly changed as well," and that their encounter with police "is a

constant source of conversation in the Fischer household as the adults have to explain

to and reassure the children [regarding the event]." (*Id*. ¶ 2.)

## III.  ANALYSIS

Against the Broomfield Defendants, the Fischers allege various constitutional

claims under 42 U.S.C. § 1983, specifically: denial of the right to familial association,

arrest without probable cause (a.k.a. false arrest), excessive force, and malicious

prosecution.  (ECF No. 53 at 20–23.)  Against the H&M Defendants, the Fischers allege

common-law malicious prosecution and intentional infliction of emotional distress.  (*Id*.

at 23–28.)  As for H&M itself, the Fischers are seeking *respondeat superior* liability.

(*See* ECF No. 103 at 19–20.)

All Defendants move for summary judgment on all of the claims asserted against them.  The Broomfield Defendants also assert qualified immunity.  The Court will first discuss qualified immunity generally, and then will address the Fischers' various claims essentially in the order in which they accrued.

## A.   Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Although summary judgment usually places the burden of persuasion on the moving party, a claim of qualified immunity shifts the burden to the non-moving party—the Fischers, in this case—to demonstrate the violation of the constitutional right and, even more significantly, that the right was clearly established at the time of the challenged conduct.  *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001).  "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th

Cir. 2014) (internal quotation marks omitted).

**B.     False Arrest of Christopher Fischer**

The Fischers assert that Deedon arrested Christopher Fischer without probable

cause (ECF No. 53 ¶ 31), although the Fischers also sometimes direct this claim at "the

police officer defendants" generally, not any specific officer (ECF No. 98 at 14).  It is

undisputed that Deedon made the decision to arrest Christopher Fischer.  (ECF No. 80

at 7, ¶ 17.)  In addition, the Fischers assert no theory by which any of the other

Broomfield Defendants could share in the liability for Deedon's decision (*e.g.*,

conspiracy, supervisory liability, failure to intervene).  The Court finds, accordingly, that

it need only examine whether Deedon had probable cause (or "arguable probable

cause," as explained below) to arrest Christopher Fischer.

1.     <u>False Arrest Generally, and its Relationship to Qualified Immunity</u>

"A plaintiff may recover damages under § 1983 for wrongful arrest" if arrested

"without probable cause."  *Cottrell v. Kaysville City*, 994 F.2d 730, 733 (10th Cir. 1993).

Probable cause exists where

> the facts and circumstances within the arresting officer's
> knowledge and of which [the officer] had reasonably
> trustworthy information are sufficient in themselves to
> warrant a person of reasonable caution to have the belief
> that an offense has been or is being committed by the
> person to be arrested.  This is an objective standard, and
> thus the subjective belief of an individual officer as to
> whether there was probable cause for making an arrest is
> not dispositive.  Whether a reasonable officer would believe
> that there was probable cause to arrest in a given situation is
> based on the totality of the circumstances.

*Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (internal quotation marks

and citations omitted; alterations incorporated).  When the arresting officer asserts

qualified immunity, the probable cause standard becomes even more deferential:

> [N]ot only must the plaintiff demonstrate that the officer
> arrested her without probable cause (that is, that he violated
> a constitutional right), but also that it would have been clear
> to a reasonable officer that probable cause was lacking
> under the circumstances (that is, that the right was clearly
> established in the specific situation).

*Id*. at 1241.  "As a practical matter, [courts] implement this standard by asking whether

there was 'arguable probable cause' for an arrest—if there was, a defendant is entitled

to qualified immunity."  *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012).

Whether probable cause existed (the ultimate liability question and the first prong

of the qualified immunity analysis) is a question for the jury if it turns on disputed facts,

*e.g.*, a question of what the officer actually observed; but it otherwise may be

determined as a matter of law by the Court.  *See, e.g.*, *Cavanaugh v. Woods Cross

City*, 718 F.3d 1244, 1253–54 (10th Cir. 2013); *Cottrell*, 994 F.2d at 734.  Qualified

immunity is a question of law, although disputes of fact that necessarily inform the

qualified immunity analysis may go to a jury.  *Maestas v. Lujan*, 351 F.3d 1001,

1007–09 (10th Cir. 2003).

2.  <u>Whether Deedon Possessed At Least Arguable Probable Cause</u>

Deedon asserts that he had arguable probable cause to arrest for the crime of

harassment under Colorado law: "A person commits harassment if, with intent to

harass, annoy, or alarm another person, he or she * * * [r]epeatedly insults, taunts,

challenges, or makes communications in offensively coarse language to, another in a

manner likely to provoke a violent or disorderly response."  Colo. Rev. Stat. § 18-9-

111(1)(h).[8]  The Colorado Supreme Court has construed this as a "fighting words"

statute, "proscrib[ing] only those words which have a direct tendency to cause acts of

violence by the persons to whom, individually, the words are addressed.  The test is

what men of common intelligence would understand to be words likely to cause an

average addressee to fight."  *People ex rel. VanMeveren v. Cnty. Court in & for Larimer*

*Cnty.*, 551 P.2d 716, 719 (Colo. 1976).

It is undisputed that Deedon had received the following information shortly

before he chose to arrest Christopher Fischer:

- from the 911 dispatcher, he learned that "a male and female customer

  were making a scene," and particularly that "[t]he male was belligerent

  and swearing at the manager" (ECF No. 80 at 5, ¶ 3 (citations omitted));

- from Jessica Fischer, he learned that Christopher had said to her, "'Wow,

  this guy [Klescewski] is an asshole,' or something to that effect" (*id*. at 6,

  ¶ 9); and

- from Klescewski, he learned that "he [had been] called an asshole and a

  jerk several times and that he felt physically threatened by Mr. Fischer"

  (*id*. ¶ 10).

The Fischers argue that this last statement from Klescewski was a lie, but it is

---

[8] The probable cause inquiry is not limited to the specific crime that the police officer believed the suspect had committed, or with which the suspect was ultimately charged, but can be satisfied by any crime that a reasonable police officer could have suspected at the time of the arrest given the knowledge that the arresting officer then possessed.  *See Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004); *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006).  However, the Broomfield Defendants do not assert any potential crime other than harassment under § 18-9-111(1)(h).  The Court therefore confines its analysis to that crime.

undisputed that Klescewski said it to Deedon.  (ECF No. 98 at 3, ¶ 10.)  The question, then, is whether a reasonable officer with such knowledge would possess arguable probable cause to conclude that Christopher had violated § 18-9-111(1)(h).

Notably, the Fischers make no argument that what Deedon knew could never establish probable cause under the fighting words standard.  (*See* ECF No. 98 at 14–16; *see also* ECF No. 97 at 13–15.)  In other words, the Fischers do not argue that, even if Deedon credited Klescewski's version of events, the conduct with which Christopher Fischer had been accused still could not amount to fighting words as a matter of law, and Deedon must have known as much.  As against the Broomfield Defendants, in fact, the Fischers cite no case law at all about fighting words.  (*Cf.* Part III.B.3, below.)

The Fischers instead argue that

> there is a disputed issue of fact as to whether the police officers' determination of probable cause has been gained from a reasonably credible victim or eyewitness.  Ms. Backus' 911 call did not once mention anything that would even meet the elements of harassment in violation of CRS 18-9-111(1)(h).  In order for there to be a violation of CRS 18-9-111(1)(h), Mr. Fisher [*sic*] would have had to repeatedly taunt or challenge or call Mr. Klescewski an "asshole" *in a manner likely to provoke a violent or disorderly response*.  It is a disputed issue of material fact whether Mr. Fischer simply referred to Mr. Klescewski as an asshole within his earshot or whether Mr. Fischer (as Mr. Klescewski alleges) repeatedly taunted him while behaving in a physically aggressive manner.

(ECF No. 98 at 15 (emphasis in original); *see also* ECF No. 97 at 15 ("Whether or not there was probable cause turns on the resolution of these disputed issues of fact.").)

So framed, then, the probable cause inquiry reduces to whether Deedon should have

known not to trust Klescewski's report—or, from a qualified immunity perspective, whether any preexisting law clearly established that Deedon should not have trusted Klescewski's report.

The Court agrees with the Fischers' assertion that a genuine factual dispute exists *between the Fischers and the H&M Defendants* over what really happened at the cash point: whether Christopher Fischer called Klescewski an asshole to his face or just in his presence, whether he said it once or multiple times, whether he displayed aggressive body language, etc. However, the Fischers do not explain how this dispute with the H&M Defendants has anything to do with whether Deedon received reasonably trustworthy information. Indeed, the Fischers assert no facts whatsoever that should have prompted Deedon (or any other officer) to conclude, on the spot, that the information received from the 911 dispatcher and/or the information learned from Klescewski was untrustworthy. Nor do the Fischers cite any case law establishing clear rules applicable to the situation in which Deedon found himself. Thus, at a minimum, the Fischers have failed to carry their burden to overcome qualified immunity. Deedon therefore possessed at least arguable probable cause to arrest Christopher Fischer for misdemeanor harassment.

In any event, the Court further finds that, to the extent actual probable cause is a fact question in this case, no reasonable jury could find it lacking given one pivotal piece of undisputed evidence. Jessica Fischer herself told Deedon that Christopher had referred to Klescewski as an asshole. Although Jessica framed this as a statement that Christopher made to her, not directly to Klescewski, the Court finds as a matter of law that this was sufficient corroboration for Deedon to believe Klescewski's own,

18

partially congruent report.

### 3.    "Fighting Words" and Qualified Immunity

As previously noted, the Fischers have not argued that any claim of "fighting

words" fails as a matter of law even under Klescewski's version of events.  At least as

against the Broomfield Defendants, the Fischers have therefore forfeited any such

argument.  *Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 791 (10th Cir. 2013) (party

forfeited counterargument that was not raised in a summary judgment response but

naturally should have been, given that it would have mooted an argument made in the

summary judgment motion).  The Court nonetheless notes the following in light of the

odd way the Fischers have argued nearly identical issues vis-à-vis the H&M

Defendants.

The Fischers' response to the summary judgment motion filed by the H&M

Defendants is mostly a verbatim duplicate of the arguments made in opposition to the

Broomfield Defendants' motion, and ultimately comes to the same place, *i.e.,* that

probable cause (an element of the common-law malicious prosecution claim against

Klescewski and Backus) turns on whether the jury believes Christopher Fischer's story

or Klescewski's story about Christopher Fischer's verbal and body language during the

cash point confrontation.  (ECF No. 97 at 13–15; *cf.* ECF No. 98 at 14–16.)  However,

unlike the response to the Broomfield Defendants' motion, the response to the H&M

Defendants' motion actually contains a case citation relevant to the fighting words

standard.  (*See* ECF No. 97 at 14–15 (citing *Klen v. City of Loveland*, 661 F.3d 498

(10th Cir. 2011)).)  In addition, about a month after the close of summary judgment

briefing, the Court permitted the Fischers to file supplemental authority that allegedly

refutes the H&M Defendants' argument "at the bottom of page 11 of their motion for

summary judgment (Document 81)" that "'asshole' in 'common parlance is an insult,

taunt or challenge,'" and therefore potentially "fighting words."  (ECF No. 106 at 1–2.)

That supplemental authority is a recent Colorado Court of Appeals decision, *People in

Interest of R.C.*, 2016 COA 166, 2016 WL 6803065 (Colo. App. Nov. 17, 2016), which

was unpublished at the time the Fischers moved to supplement and remains

unpublished today.  It likewise addresses the fighting words standard.

In *Klen*, a developer sued a municipality, alleging that municipal employees

deliberately delayed and obstructed a permitting process, leading the developer to

complain against municipal officials, including personal accusations against municipal

officials laced with profanities such as "asshole."  661 F.3d at 501, 505–06.  Following

such complaints, and allegedly because of them, the municipality issued dozens of

citations to the developer, thus prompting a lawsuit alleging First Amendment

retaliation.  *Id*.  The district court granted summary judgment in favor of the municipality

on what the municipality sensed to be a shaky basis, *id*. at 508–09, and so the

municipality presented on appeal an alternative argument in favor of the district court's

judgment: "that plaintiffs' speech deserved no constitutional protection because it was

analogous to . . . 'fighting words,'" *id*. at 509.  The Tenth Circuit held that the

developer's profanities, "objectively speaking," were not fighting words under the

circumstances presented.  *Id*.

In *R.C.*, the juvenile defendant (a middle school student) had taken a photo of a

classmate, used Snapchat to draw "a picture of an ejaculating penis next to [the

20

classmate's] mouth," and then showed the picture to other classmates.  2016 WL 6803065, ¶ 3.  The incident eventually came to adult authorities' attention and the defendant was charged with disorderly conduct.  *Id*. ¶¶ 4–5.  Disorderly conduct in Colorado requires a "coarse and obviously offensive utterance, gesture, or display in a public place and the utterance, gesture, or display tends to incite an immediate breach of the peace."  Colo. Rev. Stat. § 18-9-106(1)(a).  The trial court ruled that the defendant "knew that his drawing . . . would have tended to incite an immediate breach of the peace, in large part because the drawing implied that [the classmate was gay]."  2016 WL 6803065, ¶ 5.  Apparently the trial court also ruled that the photo was akin to calling the classmate a "cocksucker."  *Id*. ¶ 26.  The Colorado Court of Appeals reversed the conviction, reasoning that neither the photo nor the allegedly implied insult of "cocksucker" amounted to fighting words under the circumstances presented.  *Id*. ¶¶ 15–32.

To repeat, the Fischers raised none of this against the Broomfield Defendants. Even though their response briefs as to each group of Defendants are nearly identical on the probable cause analysis, the Fischers omitted the *Klen* case from their Broomfield brief; and, when they moved to supplement with *R.C.*, they specifically linked it to an argument in the H&M Defendants' motion, not any argument the Broomfield Defendants' motion.  The Court cannot interpret this as anything but a deliberate decision, for whatever reason, not to assert *Klen* and/or *R.C.* as against the Broomfield Defendants.

However, assuming out of an abundance of caution that this difference in

argumentation was an oversight—and it would be a fairly substantial oversight—the Court notes that it would not change the outcome with respect to Deedon (or any other Broomfield Defendant).   To the contrary, *Klen* and *R.C.* actually support Deedon's qualified immunity argument.

*Klen* emphasizes that "the circumstances in which [alleged fighting words] were uttered" matters greatly.   661 F.3d at 509.   "[T]he context in which words were delivered is key in determining whether they would be viewed as a constitutionally-protected expression of opinion, as opposed to fighting words."  *Id*. at 510.   Such context can include whether the alleged aggressor issued a "direct personal insult" or instead "voiced [his anger] when the targets [of his anger] were not present."  *Id*. (internal quotation marks omitted).   It may also include "[t]he reaction of actual hearers of the words," which is "significant probative evidence concerning whether the speech was inherently likely to cause a violent reaction."  *Id*.

As for *R.C.*, it cannot be considered in the qualified immunity analysis because it postdates Deedon's conduct and is not a decision from the Supreme Court or Tenth Circuit, *see Thomas*, 765 F.3d at 1194, but *R.C.* is ultimately consistent with *Klen*. Although *R.C.* contains dicta suggesting that "fighting words" is now an all-but-extinct category, *see, e.g.*, 2016 WL 6803065, ¶¶ 16–17, its actual analysis emphasizes, like *Klen*, that

> context is critical.   "[A] defendant's words are considered as a 'package' in combination with conduct and physical movements, viewed in light of the surrounding circumstances."  *In re Welfare of M.A.H.*, 572 N.W.2d 752, 757 (Minn. Ct. App. 1997); *see also People in Interest of K.W.*, 2012 COA 151, ¶ 30, 317 P.3d 1237 ("The context or

22

> circumstances in which the language is used must also be considered."). Thus, whether speech or a display constitutes fighting words must be determined on a case-by-case basis, considering all of the particular facts and circumstances.

*Id*. ¶ 22; *see also id*. ¶ 29 (discussing cases that "make clear that [whether profane language amounts to disorderly conduct] turn[s] on the totality of circumstances, particularly the threatening nature of the defendant's speech and conduct").

Here, Deedon received a report from Klescewski that Christopher Fischer had used profanity multiple times and that Klescewski had felt physically threatened by Christopher's conduct. As already discussed, Deedon was entitled to credit Klescewski's story under the circumstances, meaning that Deedon had received evidence of Christopher's language and conduct as well as the target's reaction. Particularly given the context-specific nature of "fighting words," no clearly established law could have put Deedon on notice that what he knew could never amount to probable cause under the harassment statute. Accordingly, to the extent the Fischers ever intended to argue that Deedon could never have found probable cause under any view of the evidence in this case, the Fischers have failed to meet their burden to overcome Deedon's qualified immunity.

In light of all this, Deedon is entitled to summary judgment on Christopher Fischer's false arrest claim.[9]

_____

[9] The Broomfield Defendants also present an argument that Ehrlich cannot be liable for false arrest. (ECF No. 80 at 18–19.) The Fischers, in their response, fail to address this argument. (*See* ECF No. 98 at 10–16.) Accordingly, the Court deems the Fischers to have abandoned any false arrest claim they intended to assert against Ehrlich. (*See* ECF No. 53 ¶ 31.) In any event, the analysis as to Ehrlich would have been materially identical to the analysis as to Deedon, above.

**C.     Deprivation of Christopher Fischer's Familial Association Rights**

The Fischers assert that Deedon deprived Christopher Fischer of his right to familial association when he was arrested in front of his children, "booked into the jail," and "completely separated from his family during that time."  (ECF No. 98 at 19; *see also* ECF No. 53 ¶ 30.)

1.     Familial Association Generally

The Fourteenth Amendment due process clause protects the right of familial association.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–20 (1984).  A § 1983 claim based on interference with the familial relationship requires "an allegation of intent to interfere."  *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1190 (10th Cir. 1985).  Stated differently, "to rise to the level of a constitutional claim, the defendant must *direct* his or her statements or conduct at the [familial] relationship with knowledge that the statements or conduct will adversely affect that relationship."  *Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993) (emphasis in original).

2.     Whether Deedon Intentionally Interfered with Christopher Fischer's Right to Associate with His Children

Deedon argues that the Fischers "have no evidence to support the contention that Deedon's decision to arrest Mr. Fischer was intended to deprive him of his relationship with his children."  (ECF No. 80 at 13.)  The entirety of the Fischers' response, apart from a paragraph citing generic case law, is as follows (addressing both Christopher's and Jessica's familial association claims):[10]

---

[10] Jessica's specific claim is resolved in Part III.F, below, including the question of whether "she was" in the second-to-last sentence of this passage should actually read "they were," referring to the children.

> There are disputed issues of fact regarding this claim.  If the jury finds that either Mr. Fischer or Mrs. Fischer or both were falsely arrested and therefore deprived of the association of their family members while they were in custody, then the jury can find in favor of the plaintiffs on this claim.  Mr. Fischer was wrongfully taken to and booked in the jail (unlike Mrs. Fischer) and was completely separated from his family during that time.  Even though Mrs. Fischer might have been in custody in the vicinity of her children, she had no control over where she was allowed to go.  Therefore, this claim also cannot be resolved on summary judgment.

(ECF No. 98 at 19.)

From this argument, it appears that the Fischers believe a familial association claim automatically flows from a false arrest.  To the extent this really is the Fischers' position, the Fischers cite no case law clearly establishing such a proposition of law, and therefore fail in their burden to overcome Deedon's qualified immunity.

To the extent the Fischers mean to say that a jury could consider a false arrest as evidence of intent to interfere specifically with the family relationship, the Court does not rule out such a possibility.  However, the Court has already determined that Deedon had at least arguable probable cause to arrest Christopher Fischer, and therefore cannot be liable for false arrest.  If the Fischers mean to claim that an officer who possessed probable cause to arrest can *nonetheless* be held liable for the familial separation resulting from such an arrest, the Fischers again cite no case law clearly establishing such a proposition of law, and therefore fail in their burden to overcome Deedon's qualified immunity.

Deedon is accordingly entitled to summary judgment on the Fischers' claim that Deedon interfered with Christopher Fischer's right to familial association.

25

**D.      Excessive Force Applied Against Jessica Fischer**

The Fischers accuse Vaughn of using excessive force when he struggled with Jessica to take away her phone.  (ECF No. 53 ¶ 28.)

1.      Excessive Force Generally

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis removed).  Under this standard, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).

2.      Whether Vaughn Used Excessive Force to Separate Jessica Fischer from Her Phone

Viewing the facts in the light most favorable to the Fischers, Jessica

> asked if she could use her phone, because she wanted to call a police officer friend of [hers].  And Vaughn said, "I can't have you do that."  And Mrs. Fischer said, "I'm not feeling comfortable.  I would really like to call somebody."  She had her phone in her hand the entire time.  It wasn't being pulled our [*sic*] or put away or anything else.  It was just in her hand.  And Vaughn said, "I can't have you do that.["]

(ECF No. 98 at 4, ¶ 22.)  Vaughn then reached for Jessica's phone and asked her to surrender it (ECF No. 80 at 8, ¶ 24), leading to the dance-like scuffle recounted above (Part II.E).

Properly analyzing the legal consequences of this event requires first recognizing

that Vaughn was at that time engaged in an investigatory detention, a.k.a., a "*Terry* stop," *see Terry v. Ohio*, 392 U.S. 1, 27 (1968), which could be justified by "reasonable suspicion" alone—"considerably less" than the suspicion required for probable cause. *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012) (internal quotation marks omitted). The Broomfield Defendants point this out (*see* ECF No. 80 at 20 ("Vaughn had a reasonable suspicion to stop Mrs. Fischer and question her regarding the disturbance")), and the Fischers do not contest it, thus conceding the point.[11]

While conducting a *Terry* stop, police officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). The first question, then, is whether it was reasonable for Vaughn to demand that Jessica Fischer surrender her phone in light of:

- her inquiry whether she could call a police officer friend;

- after being told "no," her statement that she "would really like to call somebody"; and

- Vaughn's training regarding an officer who had been injured because someone else at the scene texted someone elsewhere, who then came to the scene and struck the officer with a vehicle.

The question of proper cell phone use when encountering police has reached national importance and the Court does not hold that police have *carte blanche* to seize

---

[11] The only "reasonable suspicion" the Fischers attempt to refute is directed at the eventual choice to handcuff Jessica, not at Vaughn's original choice to detain her. (*See* ECF No. 98 at 12–13.)

cell phones simply by invoking "officer safety."   However, it is the Fischers' burden to show that clearly established law in December 2014 prohibited Vaughn's demand for Jessica's phone in light of her openly expressed desire to use her phone to contact someone (rather than to, *e.g.*, record the encounter on video) and Vaughn's training regarding the safety hazards of getting off-scene individuals involved in an investigatory situation.   The Fischers have not attempted to satisfy that burden—they have cited no case law at all on this issue.   They in fact seem oblivious to the fact that the burden rests on them.   (*See* ECF No. 98 at 12 (arguing that "defendants can cite no case (and none exists)" justifying Vaughn's actions).)   Given the Fischers' failure on this point, Vaughn is entitled to qualified immunity for his demand that Jessica surrender her phone.

With this established, the ultimate excessive force question is easily resolved. Although reasonableness of force employed can be a fact question, it may also be resolved by the Court as a matter of law where there is video evidence of the relevant event.  *See Scott v. Harris*, 550 U.S. 372, 386 (2007) (finding that police officer's intentional collision to end a high-speed chase was objectively reasonable given undisputed video of the chase).   Such evidence exists here in the form of the security camera video already described, which depicts an encounter involving very little force applied by Vaughn.   In that light, no reasonable jury could conclude that Vaughn used excessive force to obtain Jessica's phone.

Vaughn is therefore entitled to summary judgment on the Fischers' excessive force claim.

E.    **False Arrest of Jessica Fischer**

The Fischers accuse Vaughn and Walts of false arrest based on their choice to handcuff Jessica after the cell phone struggle.  (ECF No. 53 ¶¶ 28–29.)  This claim again must be viewed in light of the *Terry* stop circumstances.  "A detention ceases to be a *Terry* stop and becomes an arrest if it continues for an excessive time or closely resembles a traditional arrest."  *Morris*, 672 F.3d at 1192.

The Fischers claim, "There is no case law that says that police officers get to put people in handcuffs and prevent them from leaving while questioning them *unless* they are under arrest."  (ECF No. 98 at 11 (emphasis in original).)  The Fischers' counsel apparently failed to research this point (a disturbing but consistent approach to various topics throughout counsel's summary judgment briefing) because abundant case law is diametrically to the contrary.  Use of handcuffs certainly suggests a traditional arrest, but

> a *Terry* stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect . . . .  At least nine courts of appeals, including [the Tenth Circuit], have determined the use of "intrusive precautionary measures" (such as handcuffs or placing a suspect on the ground) during a *Terry* stop do not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment.

*Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997).  Thus, the Court "must determine whether the *Terry* stop escalated into an arrest."  *Id*. at 1031.

The video evidence plainly shows that Walts, who had been bringing the children back to their mother, came into view of Vaughn and Jessica Fischer as they were

struggling.[12]  "To gain control of the situation before her or her partner was harmed, she made a split second decision," *id*., to restrain Jessica with handcuffs.  She initiated the handcuffing process, and then Vaughn assisted.

As to Walts, the Court finds that she acted reasonably with the intent of ensuring officer safety given that she encountered a struggle in progress.  Thus, this initial decision to restrain Jessica with handcuffs did not amount to an arrest.  *See id*.  Moreover, the Fischers offer no case law upon which this Court could rely in determining that Vaughn had a clearly established duty under the circumstances to stop Walts from handcuffing Jessica.

The parties agree that one of the officers removed the handcuffs after "approximately five to ten minutes" (ECF No. 80 at 9, ¶ 30), which is apparently how long it took to walk from the H&M store to the mall's "Community Room" (*see id*.).  Given that handcuffing itself is permissible in some *Terry* stop situations, the Court seriously doubts that leaving the handcuffs in place for only five to ten minutes, without more, could be found to transform the *Terry* stop into an arrest.  Indeed, the Fischers do not argue as much, nor do they cite any case law clearly establishing that the officers could not leave the handcuffs on for that length of time absent probable cause, if only as a means to allow Jessica to "cool down."  Accordingly, Vaughn and Walts are at least entitled to qualified immunity for handcuffing Jessica for five to ten minutes.

The final question is whether Jessica was under arrest in the Community Room.

---

[12] This is particularly apparent in the Fischers' Exhibit B from security camera timestamps 6:30:01 to 6:30:24.  In this segment, Walts is seen casually leading the children by the hand through the store until she rounds a corner into view of Vaughn and Jessica Fischer, at which point she lets go of the children and runs to intervene in the scuffle.

Jessica asserts, "It is undisputed that she was not free to leave [the Community Room]." (ECF No. 98 at 6, ¶ 30.) The Broomfield Defendants do not deny this assertion, but it is nonetheless irrelevant because "inability to leave (or, more precisely, that a reasonable [person] would believe he is not free to leave) only establishes that there was some kind of seizure, not whether it is of the arrest or *Terry* stop variety." 4 Wayne R. LaFave, *Search & Seizure* § 9.2(g) (5th ed., Oct. 2016 update) (footnote omitted); *see also United States v. Hodges*, 215 F. App'x 737, 745 (10th Cir. 2007) ("a *Terry* detention . . . by its terms precludes the suspect from leaving the scene"). The Fischers provide no evidence of Jessica's circumstances in the Community Room, how long she was there,[13] what Vaughn and/or Walts were doing, or anything of that nature. The Fischers likewise make no false arrest argument based on Jessica's time in the Community Room, instead choosing to focus on whether the initial handcuffing was lawful. (*See* ECF No. 98 at 11–14.) Thus, there is no evidence from which the Court or a factfinder could determine whether Jessica's time in the Community Room amounted to an arrest requiring probable cause, and the Fischers' false arrest claim must fail to this extent.

Vaughn and Walts are accordingly entitled to summary judgment on the Fischers' claim that the officers falsely arrested Jessica Fischer.

## F.       Deprivation of Jessica Fischer's Familial Association Rights

The Fischers accuse Walts of interfering with Jessica Fischer's right to familial association with her children. (ECF No. 53 ¶ 30.) As already noted above (Part III.C.2),

---

[13] *See supra* note 7.

the Fischers' claim in this regard turns entirely on proving that Jessica was falsely arrested.  The Court has concluded that the Fischers cannot prove such a claim.  The familial association claim fails for this reason.

Jessica's familial association claim fails for the additional reason that the Fischers have provided no case law supporting their unique familial association theory as it relates to Jessica and the children.  Acknowledging that the children were at her side throughout the entire time Jessica was in handcuffs and in the Community Room, the Fischers claim that Jessica "had no control over where she was allowed to go." (ECF No. 98 at 19.)  This assertion makes no sense unless the Court presumes that the Fischers meant to say "where *they* were allowed to go," referring to the children. But even under this presumption, the Fischers cite no case law—much less case law clearly establishing the relevant right—supporting their apparent claim that a person may be deprived of her right to associate with her children even when the children remain immediately by her side.

Jessica Fischer's familial association theory accordingly fails as a matter of law and Walts is entitled to summary judgment both on the merits and on qualified immunity.

**G.    Malicious Prosecution of Christopher Fischer (Fourth Amendment)**

The Fischers accuse Deedon of maliciously prosecuting Christopher Fischer, in violation of the Fourth Amendment.  (ECF No. 53 ¶ 32.)

1.    Malicious Prosecution Generally

A Fourth Amendment malicious prosecution claim

includes the following elements: (1) the defendant caused

32

the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.

*Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

    2.   <u>Whether Deedon is Liable for Malicious Prosecution of Christopher Fischer</u>

Deedon focuses the bulk of his argument on an attempt to prove that the involvement of Cline, the Seventeenth Judicial District prosecutor, somehow breaks the chain of causation for any malicious prosecution claim: "many federal circuits, including the Tenth Circuit, have held that because a prosecutor initiates charges against the criminal defendant, a police officer cannot be sued for malicious prosecution under § 1983 because the 'chain of causation is broken' between the arrest and the actual prosecution." (ECF No. 80 at 24 (citing cases).)

This is a curious argument because, although true as far as it goes, it has no application here. Deedon, *not* any prosecutor, made the decision to charge. (ECF No. 98 at 8, ¶ 5.) That is apparently the typical procedure for misdemeanors in Colorado. *See* Colo. Rev. Stat. § 16-2-104 ("A summons and complaint may be issued by any peace officer for an offense constituting a misdemeanor or a petty offense committed in his presence or, if not committed in his presence, which he has probable cause to believe was committed and probable cause to believe was committed by the person charged."). The Broomfield Defendants admit that Deedon followed § 16-2-104 in this instance. (ECF No. 105 at 5, ¶ 5.) Thus, his argument must fail to the extent he believes that Cline broke the causal chain.

Deedon briefly argues, however, that the lack-of-probable-cause element also fails: "Deedon arrested Mr. Fischer on the basis of his probable cause determination for Harassment."  (ECF No. 80 at 24–25.)  The Court has already concluded that Deedon possessed probable cause to arrest.  The Fischers present no argument that Deedon nonetheless had a clearly established duty to continue investigating after Christopher had been placed in jail, *e.g.*, by obtaining security camera footage.  The Fischers also do not have evidence from which a jury could conclude that such an investigation would have given Deedon reason to change his mind.  The security camera footage has no audio and, even as to physical movements, it is impossible to tell precisely what is going on during the cash point confrontation.

Deedon is entitled to summary judgment on the Fischers' claim of malicious prosecution.[14]

## H.   Malicious Prosecution of Christopher Fischer (Common Law)

The Fischers accuse Klescewski and Backus of common-law malicious prosecution.  (ECF No. 53 ¶ 39.)

### 1.   Common-Law Malicious Prosecution, Generally

"The elements of malicious prosecution are: (1) the defendant contributed to bringing a prior action against the plaintiff; (2) the prior action ended in favor of the plaintiff; (3) no probable cause; (4) malice; and (5) damages."  *Thompson v. Maryland*

---

[14] This means that all claims against the Broomfield Defendants fail as a matter of law. These were the only federal-law claims in this case.  Although the Court could now dismiss the state-law claims for refiling in state court, *see* 28 U.S.C. § 1367(c)(3) & (d), the Court in its discretion chooses to retain jurisdiction, particularly considering the advanced stage of these proceedings, *see Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1550 (10th Cir. 1996).

*Cas. Co.*, 84 P.3d 496, 503 (Colo. 2004).  Perhaps the biggest difference between this version of malicious prosecution and the Fourth Amendment version that applies to government officials is the probable cause analysis.  In the Fourth Amendment context, probable cause is an entirely *objective* standard: it exists if any reasonable police officer under the circumstances could have arrested for any offense.[15]  In the common-law malicious prosecution context, probable cause contains a *subjective* element: "Probable cause means that *the defendant . . . in good faith believed*, and that a reasonable person, under the same or similar circumstances, would also have believed, that the plaintiff . . . was guilty of the offense with which [he or she] was charged."  Colo. Jury Instr., Civil § 17:2 (4th ed., Apr. 2016 update) (emphasis added).  This subjective element captures the possibility that an accuser may lie about the accused's actions, thus securing the accused's arrest and prosecution.  *See, e.g.*, *Anthony v. Baker*, 808 F. Supp. 1523, 1527 (D. Colo. 1992) (addressing a malicious prosecution claim in which a plaintiff presented "evidence that [the] defendant allegedly fabricated and distorted" the basis on which the plaintiff was prosecuted).

> 2.   Whether a Triable Issue of Fact Exists Regarding Klescewski and Backus "Contributing to" an Action Brought Against Christopher Fischer

The H&M Defendants argue that the Fischers "have no evidence to establish the first element, that the H&M Defendants' statements to officers proximately caused the officers to charge Mr. Fischer."  (ECF No. 81 at 11.)  But Deedon believed he had probable cause based on the 911 dispatcher's report (itself based on Backus's accusations) and on Klescewski's account of the incident.  (ECF No. 80-4 ¶ 18.)  Thus,

---

[15] *See supra* note 8.

there is sufficient evidence—indeed, undisputed evidence, as far as the Court is aware

—that Klescewski's and Backus's statements "contributed to" Deedon charging

Christopher Fischer with harassment.  The H&M Defendants are not entitled to

summary judgment on this point.

    3.    <u>Whether Proceedings Against Christopher Fischer were Favorably
Terminated</u>

The H&M Defendants contest the favorable termination element, noting that "[a]

prosecutor's dismissal of charges, by itself, is not a favorable termination."  (ECF No. 81

at 10 (citing *Allen v. City of Aurora*, 892 P.2d 333, 335 (Colo. App. 1994)).)  They argue

that "the prosecutor's affidavit [stating] that . . . Mr. Fischer's case was not dismissed

based on lack of probable cause[] preclude[s] Plaintiffs' state law malicious prosecution

claim on the third element [*i.e.*, favorable termination]."  (*Id.* at 11.)[16]

In Colorado, the existence of a favorable termination is "a question of law for the

court to decide."  *Hewitt v. Rice*, 154 P.3d 408, 416 (Colo. 2007).  The general principle

---

[16] The Fischers do not respond to this argument, but in this case their oversight is forgivable.  The header to the H&M Defendants' argument on the malicious prosecution claim is as follows: "Plaintiff Christopher Fischer's Malicious Prosecution Claim Fails Because There Was No Lack of Probable Cause and Because There Is No Evidence The H&M Defendants Acted 'With Malice.'"  (ECF No. 81 at 9 (boldface removed).)  One would therefore reasonably expect that the ensuing argument would focus on probable cause and malice.  On the next page, however, the H&M Defendants briefly cite the *Allen* case regarding favorable termination—but they do not apply any facts to that law.  (*Id.* at 10.)  Finally, on the following page, the H&M Defendants make their one-sentence argument on the favorable termination element, partially quoted above.  (*Id.* at 11.)  Quoted in full, the sentence is rather confusing grammatically, and because it invokes evidence not obviously related to favorable termination: "Further, Defendant Deedon's probable cause affidavit, and the prosecutor's affidavit that she had no contact with Klescewski or Backus and Mr. Fischer's case was not dismissed based on lack of probable cause, preclude Plaintiffs' state law malicious prosecution claim on the third element."  (*Id.*)  Cited case law following this sentence also appears to be about probable cause, not favorable termination.  Accordingly, in this instance, the Court in its discretion does not deem the Fischers to have conceded the favorable termination argument.

appears to be "'that the proceedings were terminated or abandoned at the instance of the defendant in circumstances that fairly imply the plaintiff's innocence.'"  Colo. Jury Instr., Civil § 17:1, Source & Authority cmt. 5 (*quoting* 1 F. Harper, F. James & O. Gray, Torts § 4.4 (2d ed. 1986)).  Colorado courts have cited the Restatement (Second) of Torts ("Restatement") for more specific guidance regarding favorable termination.  *See Hewitt*, 154 P.3d at 415; *Allen*, 892 P.2d at 335.  The Restatement lists "the formal abandonment of the proceedings by the public prosecutor" as an instance of favorable termination, § 659(c), "except under the conditions stated in §§ 660 and 661," *id*. cmt. e. The conditions stated in § 660 comprise withdrawal of the charges on account of a plea bargain, the accused's actions frustrating a trial, the prosecutor's decision to show mercy, or institution of other proceedings for the same offense.  The condition stated in § 661 requires "the impossibility or impracticability of bringing the accused to trial."

None of those conditions exist here.  Moreover, under the more general principle of "circumstances that fairly imply the defendant's innocence," favorable termination is satisfied because Cline says she dismissed the charges due to lack of confidence that the Christopher Fischer's guilt could be proved beyond a reasonable doubt.  (ECF No. 80-9 ¶ 5.)  This fairly implies Christopher Fischer's innocence.

As a matter of law, then, the Fischers have satisfied the favorable termination element and that is no longer an issue for trial.  *See* Fed. R. Civ. P. 56(g).[17]

4.   Whether a Triable Issue of Fact Exists Regarding Probable Cause

The H&M Defendants note that the existence of probable cause is "a complete

---

[17] The parties' proposed jury instructions should reflect as much.

defense" to malicious prosecution.  (ECF No. 81 at 10 (quoting *Anthony*, 808 F. Supp. at 1526).)  The H&M Defendants further argue that probable cause existed under the harassment statute previously discussed, Colo. Rev. Stat. §  18-9-111(1)(h).  (*Id*. at 11–12.)  The Fischers respond that Christopher Fischer's alleged conduct may not have amounted to fighting words.  (ECF No. 97 at 14–15; *see also* ECF No. 106.)  The H&M Defendants reply that "the constitutional test for 'fighting words'" is not at issue (ECF No. 104 at 7)—apparently oblivious to the Colorado Supreme Court's holding in *VanMeveren*, *supra*.

As noted above in the Court's analysis of *Klen* and *R.C.* (Part III.B.3), "fighting words" is a context-specific question.  As also noted above (Part II.B), the Fischers and the H&M Defendants have differing views of what Christopher Fischer actually did and said at the cash point on the evening in question.  Competent evidence supports both stories, and a reasonable jury could believe either one.  In particular, if a jury believes the Fischers' story, it implies that Klescewski's story (and Backus's account of it to the 911 operator) was a fabrication, or at least a significant exaggeration, in turn implying that Klescewski and Backus did not subjectively believe their own accusations.

There is also a triable question regarding the objective component of the common-law probable cause standard.  Even if a jury accepts Klescewski's version of events, a jury would still need to determine whether a reasonable person in the same circumstances would have believed that Christopher Fischer had committed a crime.

For these reasons, the Court cannot hold as a matter of law on this record that the Fischers will be unable to satisfy the lack-of-probable-cause element of their malicious prosecution claim.

5.    Whether a Triable Fact Issue Exists Regarding Malice

The H&M Defendants argue that the Fischers cannot establish the malice element.  (ECF No. 81 at 12.)  A defendant "was motivated by malice if [his or her] primary motive was a motive other than a desire to bring to justice a person [he or she] thought had committed a crime."  Colo. Jury Instr., Civil § 17:4.  Lack of probable cause "may indicate malice," but a jury may not find malice based on lack of probable cause without first "consider[ing] all the circumstances surrounding the filing and prosecution of the criminal case."  *Id*. § 17:5; *see also* Restatement § 669 ("Lack of probable cause for the initiation of criminal proceedings, in so far as it tends to show that the accuser did not believe in the guilt of the accused, is evidence that he did not initiate the proceedings for a proper purpose.").

Here, although a close question, the Fischers have minimally sufficient evidence from which a jury could conclude in their favor on the malice element.  If the jury disbelieves Klescewski's story and believe the Fischers' story that Klescewski instructed Backus to call 911, a jury could find that Klescewski had an intent to retaliate for being referred to as an asshole, and not to quell a legitimate disturbance in his store.  Moreover, Backus made assertions to the 911 operator that, as far as the current record reveals, were pure fabrications.

A broader question exists, not really addressed by any party, regarding whether Klescewski and/or Backus had any intent to see Christopher Fischer arrested or charged with a crime, as opposed to simply removed from the store or prevented from returning for a time.  Evidence as to this may fairly be weighed by the jury in considering the malice element.  But, as a matter for the jury, it may not be resolved at summary

judgment.  For all of these reasons, the H&M Defendants are not entitled to summary

judgment on the Fischers' common-law malicious prosecution claim.

**I.      Intentional Infliction of Emotional Distress**

The Fischers accuse the H&M Defendants of intentional infliction of emotional

distress (ECF No. 53 ¶ 28), sometimes denominated "outrageous conduct" or "extreme

and outrageous conduct" in Colorado, *see* Colo. Jury Instr., Civil § 23:1.  The Court will

refer to it as "IIED."

1.      IIED Generally

An IIED claim requires the plaintiff to prove:

> 1. The defendant engaged in extreme and outrageous
> conduct;
>
> 2. The defendant did so recklessly or with the intent of
> causing the plaintiff severe emotional distress; and
>
> 3. The defendant's conduct caused the plaintiff severe
> emotional distress.

*Id*.  This tort "was designed to create liability for a very narrow type of conduct."  *Green*

*v. Qwest Servs. Corp.*, 155 P.3d 383, 385 (Colo. App. 2006).  Consequently,

> the level of outrageousness required to [satisfy the first
> element of the cause of action] is extremely high. . . .  Only
> conduct that is so outrageous in character, and so extreme
> in degree, as to go beyond all possible bounds of decency
> and be regarded as atrocious and utterly intolerable in a
> civilized community, will suffice.

*Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003); *see also Churchey v. Adolph*

*Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (facts must so arouse resentment against

the defendant in average members of the community as to lead them to exclaim,

"Outrageous!").  Colorado law requires the trial court to act as a gatekeeper as to the

first element of the claim.  *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo.

1994) ("Although the question of whether conduct is outrageous is generally one of fact

to be determined by a jury, it is first the responsibility of a court to determine whether

reasonable persons could differ on the question.").

      2.      <u>Whether the Fischers Have Satisfied the "Outrageous!" Standard</u>

Viewing the facts in the light most favorable to the Fischers, Klescewski falsely

told the police that Christopher Fischer had called him an asshole multiple times to his

face, in a physically threatening manner; and Backus falsely told the 911 operator that

the disturbance was ongoing.  The Court cannot condone such conduct, but the Court

finds that these allegations do not meet "the exacting standard required to state a claim

for intentional infliction of emotional distress."  *Maiteki v. Marten Transp. Ltd.*, 4 F.

Supp. 3d 1249, 1256 (D. Colo. 2013) (repeated reporting of false information to a credit

agency does not satisfy the IIED standard); *see also Coors Brewing Co. v. Floyd*, 978

P.2d 663, 666 (Colo. 1999) (claim that employer coerced employee into conducting an

illegal undercover narcotics investigation and laundering money to fund such

investigation, and then firing employee for such investigation was not outrageous

conduct); *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 991 (Colo. App. 2011)

(inpatient rehabilitation facility's employees "were abrupt, irresponsible, and lacking in

sensitivity" when responding to a wife's concerns about her inpatient husband's

dangerously low blood pressure, and one employee even falsified an entry on the

husband's chart to show normal blood pressure, but none of the employees could be

liable for IIED); *Green*, 155 P.3d at 386–87 (allegations that employer sent untrained

and under-qualified workers to perform dangerous acts was not sufficient to state a claim for outrageous conduct).  The H&M Defendants are therefore entitled to summary judgment on the Fischers' IIED claim.

**J.    Exemplary Damages**

The Fischers seek exemplary damages against the H&M Defendants.  (ECF No. 53 ¶¶ 36, 39.)  The H&M Defendants argue that the Fischers cannot meet the exemplary damages standard as a matter of law.  (ECF No. 81 at 17–20.)

1.    Exemplary Damages Generally

In Colorado, a jury may award exemplary damages "equal to the amount of actual damages awarded to the injured party" where "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct."  Colo. Rev. Stat. § 13-21-102(1)(a).  Colorado law is confusing regarding the difference between "malice" and "willful and wanton conduct."  On the one hand, the statute itself defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."  *Id*. § 13-21-102(1)(b).  On the other hand, "malice" is undefined, and the only Colorado Supreme Court construction the Court could locate says that malice "may be found by the jury or the court from the reckless and wanton acts of the injuring party such as disclose an utter disregard of consequences."  *Carlson v. McNeill*, 162 P.2d 226, 230 (Colo. 1945) (interpreting prior codification of the statute) (internal quotation marks omitted; emphasis removed).  But this same decision also emphasized that "malice" was a basis separate from the other bases in the statute for awarding exemplary

42

damages, presumably including "willful and wanton conduct." *See id*. ("the circumstances under which exemplary damages may be awarded are expressed in the alternative").

    2.    <u>Whether the Record Supports a Potential Award of Exemplary Damages</u>

Like the malice element of malicious prosecution (which does not appear to be the same thing as the malice theory of exemplary damages), the Court finds the evidence minimally sufficient (and then only barely so), on this record to submit the question of exemplary damages to the jury. Assuming the evidence introduced at trial continues to justify a potential exemplary damages award and the jury actually returns an exemplary damages award, the Court retains power to

> reduce or disallow the award of exemplary damages to the extent that:
>
> (a) The deterrent effect of the damages has been accomplished; or
>
> (b) The conduct which resulted in the award has ceased; or
>
> (c) The purpose of such damages has otherwise been served.

Colo. Rev. Stat. § 13-21-102(2). The current record provides a fairly substantial indication that one or more of the circumstances exist, but the Court will defer any such determination to post-trial proceedings in light of the evidence and verdict as it actually comes in. The H&M Defendants are therefore not entitled to summary judgment on the Fischers' claim for exemplary damages.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    The Broomfield Defendants Amended Motion for Summary Judgment (ECF No. 80) is GRANTED;

2.    Defendants Josh Vaughn, Michael Deedon, Jeremy Ehrlich, and Heidi Walts are entitled to judgment in their favor on all claims asserted against them, and such judgment will enter at the close of this case;

3.    The H&M Defendants' Motion for Summary Judgment (ECF No. 81) is GRANTED with respect to the Fischers' claim of intentional infliction of emotional distress, and otherwise DENIED; and

4.    This case REMAINS SET for a Final Trial Preparation Conference on May 5, 2017, at 11:00 a.m., and a 5-day Jury Trial beginning on May 22, 2017, at 8:30 a.m., both in Courtroom A801.  Counsel for the Fischers and for the H&M Defendants are again directed to this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial.

Dated this 22nd day of March, 2017.

BY THE COURT:

_____

William J. Martinez
United States District Judge